UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARCIA PEREIRA | * | |
|  | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | |
|  | * | Civil Action No. 24-cv-12744-ADB |
|  | * | |
| The Estate of MARIA JOSE OLIVEIRA and GEORGE SOUSA, | * | |
|  | * | |
| Defendants. | * | |
|  | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Marcia Pereira ("Pereira") brings this action against the Estate of Maria Jose Oliveira (the "Estate") and George Sousa ("Sousa," collectively, "Defendants"), Oliveira's attorney and the personal representative of the Estate, alleging violations of the federal Fair Labor Standards and Trafficking Victims Protection Reauthorization Acts, Massachusetts employment and civil-rights laws, and Massachusetts common law. [ECF No. 25 ("Amended Complaint" or "Am. Compl.")]. Currently before the Court is Sousa's motion to dismiss for failure to state a claim. [ECF No. 26]. For the reasons set forth below, the motion is **GRANTED**.

I.   BACKGROUND

   A.   Factual Background

The following facts are drawn from the Amended Complaint. For purposes of this motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir. 2020)).

Pereira, a Black immigrant of Brazilian ethnicity, "was employed by [Maria Jose] Oliveira as a domestic worker" from on or around May 28, 2020 until approximately April 25, 2022. [Am. Compl. ¶ 12]. In her initial job interview, in April 2020, Pereira was told she would be paid $660 a week. [Id. ¶ 13]. This compensation "seemed low" to her, but she "felt that she had no other option" given the COVID-19 pandemic and her circumstances at the time. [Id. ¶ 14]. Pereira understood the position to include eldercare and light cleaning tasks. [Id. ¶ 15].

The "true nature" of the work, [Am. Compl. ¶ 16], and "the true delicate and demanding character" of Oliveira's medical conditions, however, were not disclosed to Pereira until the day before she began working for Oliveira, [id. ¶ 17]. Beyond "merely being an eldercare aid," [id. ¶ 18], bathing Oliveira, cooking for her, cleaning her apartment, and doing her laundry, [id. ¶ 32], Pereira was also expected to perform specialized tasks such as cleaning Oliveira's ruptured colostomy bag up to two to three times a day, [id. ¶ 18]. She also "was forced to clean up human bodily fluids without any protection on many occasions." [Id. ¶ 31]. Pereira worked long hours, averaging 96 hours per week, with few breaks and little sleep. [Id. ¶¶ 20–24]. During the first year of employment, Pereira also worked in "extreme heat and cold temperatures," until her co-worker brought "her own space heater and air conditioner to the home." [Id. ¶ 35]. Pereira was

"usually" paid $500 per four-day "shift." [Id. ¶ 13]. She was expected to supply, at her own expense, enough food for herself and Oliveira for the duration of her four-day shift. [Id. ¶¶ 33–34].

Beginning in 2022, Oliveira promised to raise Pereira's salary to $10 per hour, an increase from the $660 a week that Pereira was previously "supposed to" make, which "translated to . . . $6.87 per hour." [Am. Compl. ¶ 37]. Pereira never received a raise despite repeatedly requesting one. [Id. ¶¶ 38–44]. Oliveira also promised to help "legalize [Pereira] in exchange for her continued employment," [id. ¶ 46], by "apply[ing] for [Pereira's] change of legal immigration status," [id. ¶ 54]. These promises, and Pereira's fear that Oliveira, who had "substantial real estate interests" and "was very well known in the community," would retaliate against her, [id. ¶ 61], compelled Pereira to keep working for Oliveira, despite the "severe conditions" of her employment, [id. ¶ 42]. Pereira experienced depression, humiliation, and sadness because of the conditions of her employment. [Id. ¶ 62].

Sousa was Oliveira's attorney and later served as the personal representative of the Estate. [Am. Compl. ¶ 44]. Sousa also, according to the Amended Complaint, "actively participat[ed] and advis[ed] in all aspects of [Pereira's] employment including but not limited to hiring and compensation." [Id. ¶ 48]. He was present at Pereira's job interview, [id. ¶ 13], advised Oliveira against granting Pereira's request for a raise, and "instructed Mrs. Oliveira not to pay [Pereira] the lawful hourly minimum wage and overtime premium due to her immigration status," [id. ¶ 44]. Sousa was "well aware and fully supported [Pereira]'s working conditions." [Id.]. Oliveira told Pereira that she would "consult" with Sousa about minimum wage requirements and correct her pay, [id. ¶ 59], but Pereira's pay never changed, [id. ¶ 38].

According to the Amended Complaint, Sousa's "actions were influenced by discriminatory animus against [Pereira] for being of Brazilian ethnicity." [Am. Compl. ¶ 44]. Oliveira told Pereira that Sousa "routinely expressed his repulsion of [Pereira] because of her immigration status." [Id. ¶ 45]. Oliveira made discriminatory and racist comments to Pereira, [id. ¶¶ 49, 52–53], "after consulting with and being counseled by" Sousa, [id. ¶ 50]. Oliveira said that Sousa shared her views and "advise[d] her, as her legal counsel, to not take any remedial actions to better [Pereira's] working conditions on specific account of her immigration status." [Id. ¶ 51].

### B. Procedural History

Pereira brought the instant action against the Estate on October 29, 2024. [ECF No. 1]. After Sousa moved to dismiss, [ECF No. 7], Pereira moved to amend her complaint, [ECF No. 11]. The Court held a hearing on February 26, 2025, and granted Pereira's motion to amend, which mooted Sousa's pending motion to dismiss. [ECF No. 24.] Pereira filed her Amended Complaint on March 5, 2025, adding Sousa as a defendant. [Am. Compl.]. On March 13, 2025, Sousa moved to dismiss all claims against him for failure to state a claim, [ECF No. 26], Pereira opposed the motion on March 27, 2025, [ECF No. 30], and Sousa replied on April 2, 2025, [ECF No. 31].

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pled facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations omitted) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679).

### III.   DISCUSSION

The Amended Complaint includes eight claims for relief, under (1) the Massachusetts Wage Act ("Wage Act"), Mass. Gen. Laws ch. 149, § 148; (2) the Massachusetts Fair Minimum Wage Law ("FMWL"), Mass. Gen. Laws ch. 151, § 1A; (3) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201; (4) the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589; (5) the Massachusetts Domestic Workers Bill of Rights Act ("DWBORA"), Mass. Gen. Laws ch. 149, § 190; (6) the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H, 11l; (7) Massachusetts common law; and (8) the Massachusetts Equal Rights Act ("MERA"), Mass. Gen. Laws ch. 93, § 102.

### A. FLSA, Wage Act, FMWL, and DWBORA Claims (Counts I, II, III, V)

Pereira's employment-law claims against Sousa rest on the premise that Sousa was Pereira's employer. Because the Amended Complaint does not support this premise, these claims fail.

To state a claim against Sousa under the FLSA, the Wage Act, the FMWL, and the DWBORA, Pereira must plausibly allege that Sousa was her employer. More specifically, to assert a claim under the FLSA, Pereira must demonstrate that an employment relationship existed between her and Sousa. Hamilton v. Partners Healthcare Sys., Inc., 209 F. Supp. 3d 379, 389 (D. Mass. 2016) ("The existence of the FLSA cause of action . . . is dependent on a threshold finding that Plaintiffs are employees of Defendants under the FLSA."), aff'd, 879 F.3d 407 (1st Cir. 2018). The Massachusetts statutes likewise require Pereira to demonstrate that she was Sousa's employee. See Klauber v. VMware, Inc., 599 F. Supp. 3d 34, 46 (D. Mass. 2022) (requiring Wage Act plaintiff to demonstrate that he "was an employee under the statute"), aff'd, 80 F.4th 1 (1st Cir. 2023); Rogier v. Chambers, No. SUCV201502876BLS1, 2016 WL 5890024, at *3 (Mass. Super. Sept. 1, 2016) ("To have standing to sue for a violation of the [Wage Act and the FMWL], the plaintiff must be an 'employee.'" (quoting Mass. Gen. Laws ch. 149, § 150)); Mass. Gen. Laws ch. 149, § 190(a) (defining domestic workers covered by DWBORA as "individual[s] or employee[s] who [are] paid by an employer to perform work of a domestic nature within a household").

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and "employ" as "to suffer or permit to work," id. § 203(g). In assessing "whether an employment relationship exists" under the FLSA, courts apply an "economic reality" test. Baystate Alt. Staffing, Inc. v.

Herman, 163 F.3d 668, 672 (1st Cir. 1998) (quoting Aimable v. Long & Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994)). That test examines "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Id. at 675; see also Danio v. Emerson Coll., 963 F. Supp. 61, 63 (D. Mass. 1997) ("Under this test, courts examine the purported employer's job description, financial interest in the workplace, involvement in decisions affecting the plaintiff's employment terms, conditions and compensation, and relative operational control in the workplace."). The first and second factors "address the extent of a putative employer's control over the nature and structure of the working relationship," while the third and fourth factors "address the extent of a putative employer's control over the economic aspects of the working relationship." Baystate, 163 F.3d at 675–76. "[T]he totality of the circumstances, and not any one factor" determines whether an individual can be held personally liable as an employer. Id. at 676; see also Chao v. Hotel Oasis, Inc., 493 F.3d 26, 33–34 (1st Cir. 2007) (using "economic reality" test to assess personal liability of corporate officers). Courts also use the "economic reality" test to determine whether an entity is a joint employer. See Baystate, 163 F.3d at 675.

The Wage Act and FMWL do not expressly define the term "employer." Rogier, 2016 WL 5890024, at *3 ("[The Wage Act] do[es] not define the term 'employer.'"); Jinks v. Credico (USA) LLC, 177 N.E.3d 509, 518 & n.11 (Mass. 2021) (noting that the FMWL does not "define 'employer'"). But see Segal v. Genitrix, LLC, 87 N.E.3d 560, 567 (Mass. 2017) (holding that the Wage Act "defines 'employer' as a 'person having employees in his [or her] service'" (quoting Mass. Gen. Laws ch. 149, § 148)). The Massachusetts Supreme Judicial Court has held, however, that "the entity for whom the individual directly performs services is ordinarily

the individual's employer responsible for compliance with the wage laws." Jinks, 177 N.E.3d at 516.[1] Moreover, to determine whether an entity is a "joint employer" under the wage laws, Massachusetts courts apply the "economic reality" test developed by federal courts in FLSA cases. See id. at 520; Garcia v. Right at Home, Inc., No. SUCV20150808BLS2, 2016 WL 3144372, at *3 (Mass. Super. Jan. 19, 2016) (applying "economic reality" test to Wage Act and FMLA claims).[2]

The DWBORA defines "employer" as "a person who employs a domestic worker to work within a household," and excludes "staffing agenc[ies], employment agenc[ies] [and] placement agenc[ies]." Mass. Gen. Laws ch. 149, § 190(a). "[E]mploy" is defined as "to suffer or permit to work," id., a definition that is identical to that of the FLSA, see 29 U.S.C. § 203(g), and the FMWL, see 454 Mass. Code Regs. 27.02 (2016). Thus, the Court concludes that

---

[1] Jinks involved claims brought under the FMWL, not the Wage Act. Nevertheless, the Jinks court spoke broadly of "the wage laws," rather than specifically limiting its analysis to the FMWL. 177 N.E.3d at 520. Accordingly, this Court assumes, as do the parties, [ECF No. 27 at 8; ECF No. 30 at 10], without deciding, that the Jinks formulation applies to both to FMWL and Wage Act claims.

[2] The parties assert that the "economic reality" test for joint employment also applies to claims brought under the Wage Act. See [ECF No. 27 at 8–9]; [ECF No. 30 at 10–11]. Accordingly, the Court assumes without deciding that FLSA caselaw governing joint employment also applies to Pereira's Wage Act claim. The Court notes, however, that some pre-Jinks cases applied common-law principles to determine the existence of an employment relationship under the Wage Act, and considered "a number of factors, including the right of the employer to control the details of the work done by the employee." Chase v. Indep. Prac. Ass'n Inc., 583 N.E.2d 251, 253 (Mass. App. Ct. 1991). But see Garcia, 2016 WL 3144372, at *3 (applying "economic reality" test to Wage Act and FMLA claims). Such common-law principles are more restrictive than the "economic reality" test, that is, fewer individuals qualify as employees under the common-law test than under the FLSA. See Baystate, 163 F.3d at 675 (holding that "the remedial purposes of the FLSA require courts to define '"employer" more broadly than the term would be interpreted in traditional common law applications.'" (quoting Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir.1991))). If Pereira cannot satisfy the more liberal "economic reality" test for joint employment for purposes of her FLSA and FMWL claims, it follows that she also cannot satisfy more restrictive test for purposes of her Wage Act claim.

whether Sousa was Pereira's employer within the meaning of the DWBORA is subject to the same analysis as for Pereira's FLSA and Massachusetts wage law claims.

Here, the Amended Complaint asserts that "Defendants," including Sousa, were Pereira's employer within the meaning of all relevant statutes, [Am. Compl. ¶¶ 2, 6], but it does not allege sufficient facts to support that conclusion. Pereira claims that Sousa was present at her job interview, [id. ¶ 13], and "actively participat[ed] and advis[ed] in all aspects of [Pereira's] employment," [id. ¶ 48], including advising and "instruct[ing]" Oliveira on Pereira's pay, [id. ¶ 44], and working conditions, [id. ¶¶ 51, 59]. Even drawing all reasonable inferences in Pereira's favor, these actions do not transform Sousa from being simply Oliveira's lawyer and advisor into being Pereira's employer.

To begin with, the Amended Complaint nowhere suggests that Pereira "directly perform[ed] services" for Sousa, rather than Oliveira. Jinks, 177 N.E.3d at 516. Nor has Pereira plausibly alleged that Sousa was her employer under Baystate's "economic reality" test. While Sousa may have advised Oliveira on, and even participated to some degree in, matters concerning Pereira's work, the Amended Complaint does not plead, or permit the reasonable inference, that Sousa exercised sufficient "control over the nature and structure of the working relationship" or "over the economic aspects of the working relationship" to qualify as Pereira's employer. Baystate, 163 F.3d at 675–76. Sousa's mere presence at Pereira's job interview, [Am. Compl. ¶¶ 13, 48], without more, is not sufficient to plausibly suggest that he had the power to hire or fire her. See Bedasie v. Mr. Z Towing, Inc., No. 13-cv-5453, 2017 WL 1135727, at *17 (E.D.N.Y. Mar. 24, 2017) ("[E]ven if [defendant] was present during the plaintiffs' interviews and may have even conducted the interviews and described the job

responsibilities and pay, the evidence presented does not support a finding that she had the power to make the hiring and firing decisions or set the rates of pay without the input of her husband.").

Although a somewhat closer call, the fact that Sousa advised (or "instructed") Oliveira not to improve Pereira's working conditions or raise her salary, [id. ¶¶ 44, 50–51, 59], is also not enough to plausibly suggest that Sousa "<u>supervised and controlled</u> . . . [the] conditions of [Pereira's] employment" or "<u>determined</u> the rate and method of [her] payment," Baystate, 163 F.3d at 675 (emphasis added). In fact, the Amended Complaint's allegations that Oliveira "promised . . . [to] <u>consult</u>," [Am. Compl. ¶ 59 (emphasis added)], with Sousa about Pereira's wages and that Sousa "<u>advise[d]</u> [Oliveira] . . . to not take any remedial actions to better [Pereira]'s working conditions," [id. ¶ 51 (emphasis added)], strongly suggest that it was Oliveira, not Sousa, who ultimately controlled Pereira's wages and working conditions, and Pereira has not pleaded any other facts from which the Court could infer that Sousa exercised sufficient control over the working relationship to qualify as her employer.

Moreover, even if Pereira's allegation that Sousa "instructed," [Am. Compl. ¶ 44], Olivera not to pay Pereira a lawful wage were sufficient to show that Sousa "had some authority to determine the rate and method of her payment, . . . that one factor is not sufficient to demonstrate that [Pereira] was 'economically dependent' on [Sousa]." Cavallaro v. UMass Mem'l Health Care, Inc., 971 F. Supp. 2d 139, 150 (D. Mass. 2013). Drawing all reasonable inferences in Pereira's favor, "the totality of the circumstances" suggests that Sousa was Oliveira's advisor and counsellor, not Pereira's employer for purposes of the FLSA, the Wage Act, the FMWL, or the DWBORA. Baystate, 163 F.3d at 676; cf. Mitchell v. Ceros, Inc., No. 21-cv-1570, 2022 WL 748247, at *4 (S.D.N.Y. Mar. 10, 2022) (finding that plaintiff had "just barely" alleged that defendant was her employer where defendant "held an employee-facing

position of leadership in the company and was a participant in several critical events," including plaintiff's job interview, a company-wide "Slack discussion" in which management discussed hiring plaintiff and "the group decided" to offer her a salary of $90,000, "one of two meetings about [p]laintiff's complaints" of wage discrimination, and "discussions among senior leadership regarding [p]laintiff's termination").

Pereira argues that Sousa and Oliveira jointly employed her. [ECF No. 30 at 10–12]. Although Pereira is correct that "there may be multiple 'employers' who are simultaneously liable for compliance with the FLSA," Chao, 493 F.3d at 34, to establish liability against multiple employers under a joint-employer theory, each individual employer must independently satisfy the "economic reality" test, Hamilton, 209 F. Supp. at 391 ("[T]here must be some element of an actual employment relationship between an employee and each putative joint employer."). Because Pereira fails to plausibly allege that she had an employment relationship with Sousa, she also cannot show that he was her joint employer. Accordingly, Sousa's motion to dismiss Counts I, II, III, and V is **GRANTED**.[3]

---

[3] Emphasizing that the existence of an employment relationship is a "fact-intensive" issue and that "much" of the necessary information is "uniquely within Defendant's control," Pereira argues that she should be allowed to proceed to discovery. [ECF No. 30 at 19–20]. Here, however, even drawing all inferences in Pereira's favor, the Amended Complaint does not plausibly allege that Sousa was Pereira's employer, joint or otherwise, so she is not entitled to discovery. See, e.g., Cavallaro, 971 F. Supp. 2d at 150 (granting motion to dismiss FLSA claim where complaint "include[d] allegations . . . that are relevant to one of the Baystate actors," but "d[id] not set forth a plausible claim that [defendant] exercised sufficient control over [plaintiff's] employment conditions to be considered an employer under the FLSA"); see also Parker v. Landry, 935 F.3d 9, 18 (1st Cir. 2019) ("A plaintiff must state a plausible claim before she can invoke a right to discovery." (emphasis added)).

11

## B.     TVPRA Claim (Count IV)

The TVPRA prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person by" forbidden means, 18 U.S.C. § 1589(a), including, as relevant here, "by means of serious harm or threats of serious harm . . . [or] by means of the abuse or threatened abuse of law or legal process," id. § 1589(a)(2), (3), and creates a private right of action for victims, id. § 1595(a).  The TVPRA also forbids "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by such forbidden means.  Id. § 1589(b).  The statute thus creates liability for both "primary offender[s]" and those who "simply . . . benefit[] financially from participation in a 'venture' with the primary offender."  Bistline v. Parker, 918 F.3d 849, 871 (10th Cir. 2019).  In assessing TVPRA claims, courts must "give attention to the whole body of allegations."  Ricchio v. McLean, 853 F.3d 553, 557 (1st Cir. 2017) (Souter, J.).

Pereira identifies Oliveira as the primary offender and seeks to proceed against Sousa under a theory of venture liability.  [ECF No. 30 at 12].  To state a claim for venture liability under the TVPRA, a plaintiff must plausibly allege "(1) a wrongful act that causes an injury, specifically forced labor; (2) knowledge, as the defendant must knowingly benefit; and (3) substantial assistance, namely participation in the 'venture.'"  Doe 1 v. Apple Inc., 96 F.4th 403, 411 (D.C. Cir. 2024).  Here, Pereira's TVPRA claim fails at the first step because she has not plausibly alleged forced labor within the meaning of the statute.  Specifically, she has not alleged that Defendants obtained her labor through "threats of serious harm" or "threatened abuse of law or legal process."  18 U.S.C. § 1589(a)(2), (3).

The TVPRA defines "serious harm" as "any harm, . . . including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same

12

background and in the same circumstances to perform or to continue performing labor or services." Id. § 1589(c)(2). It defines "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process . . . in any matter or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." Id. § 1589(c)(1). "A threat of deportation can act as a threatened serious harm under § 1589(a)(2) or threatened abuse of legal process under § 1589(a)(3)." Yassin v. AR Enters., LLC, No. 16-cv-12280, 2017 WL 6625027, at *3 (D. Mass. Dec. 28, 2017); see also Magtoles v. United Staffing Registry, Inc., No. 21-cv-01850, 2021 WL 6197063, at *7 (E.D.N.Y. Dec. 30, 2021) (finding that contractual provision warning that defendant "would notify immigration authorities about any change in [plaintiffs'] employment status and that such notification 'may lead to . . . deportation,'" as well as alleged threats of litigation contributed to a plausible allegation of serious harm under the TVPA). Similarly, threatening to withdraw immigration sponsorship may constitute abuse of legal process under § 1589(a)(3). Adia v. Grandeur Mgmt., Inc., 933 F.3d 89, 93 (2d Cir. 2019) ("[D]efendants' threat that they would withdraw [plaintiff's] sponsorship could plausibly be understood as a scheme to convince him that he would be harmed by deportation if he left or asked for overtime pay.").

Here, Pereira claims that her economic circumstances "made her feel compelled" to begin working for Oliveira. [Am. Compl. ¶ 14]. She also claims that she feared "retaliatory acts," [id. ¶ 60], and "retribution," including being "blacklisted from any other gainful employment," from Oliveira because of Oliveira's wealth and her standing in the community, [id. ¶ 61]. Finally, she asserts that Defendants "baited [her] into staying employed" by "us[ing] false promises of

13

immigration status or sponsorship," [id. ¶ 54], that "compelled [her] to continue working for the Defendants," [id. ¶ 76].

Even drawing all inferences in Pereira's favor, these allegations fall short of pleading the requisite "wrongful act" for purposes of the TVPRA. Apple Inc., 96 F.4th at 411. Making empty promises of immigration sponsorship to Pereira is not the same as threatening deportation or threatening to withdraw existing immigration sponsorship, as in Yassin and Adia. Such empty promises may be cruel and unethical (and otherwise actionable), but they do not amount to a threat of "serious harm" or "abuse of . . . legal process," 18 U.S.C. § 1589(a)(2), (3).

"[G]iv[ing] attention to the whole body of allegations," Ricchio, 853 F.3d at 557, Pereira has not sufficiently alleged that Defendants "knowingly provided or obtained . . . labor" from her through prohibited means, 18 U.S.C. § 1589(a). Without such a wrongful act, there can be no venture liability for Sousa. Apple Inc., 96 F.4th at 411. Sousa's motion to dismiss Count IV is therefore **GRANTED**.[4]

### C. MCRA and MERA Claims (Counts VI and VIII)

Plaintiff seeks to assert claims under MCRA and MERA. [Am. Compl. ¶¶ 80–84, 88–92]. Sousa argues that none of the conduct relevant to these claims is attributable to him, and that the claims are, in any case, preempted by Mass. Gen. Laws. ch. 151B, which sets forth the exclusive remedy for employment discrimination claims. [ECF No. 27 at 16–18; ECF No. 31 at 5–6]. Because the Court agrees that Pereira's MCRA and MERA claims are preempted, it need not reach the merits of these claims.

---

[4] Pereira's briefing focuses on whether Sousa "knowingly benefit[ed]" from Pereira's labor or participated in a "venture" with Oliveira. [ECF No. 30 at 12–15]. Because she has failed to sufficiently allege the necessary wrongful act of forced labor, the Court does not reach these issues. See Apple Inc., 96 F.4th at 411.

14

"Chapter 151B, where applicable, 'provides the <u>exclusive</u> remedy for employment discrimination not based on preexisting tort law or constitutional protections.'" <u>James v. Bos. Police Dep't</u>, No. 19-cv-10430, 2020 WL 108266, at *4 (D. Mass. Jan. 9, 2020) (quoting <u>Charland v. Muzi Motors, Inc.</u>, 631 N.E.2d 555, 559 (Mass. 1994)); <u>see also</u> Mass. Gen. Laws ch. 151B, § 9 ("[A]s to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned."). Thus, where Chapter 151B remedies are or were available, a plaintiff may not pursue a claim under MCRA or MERA. <u>James</u>, 2020 WL 108266, at *4; <u>see also</u> <u>Gordon-Johnson v. Clinical & Support Options, Inc.</u>, 766 F. Supp. 3d 319, 324 (D. Mass. 2025) ("Courts considering whether a Plaintiff's Chapter 151B claim preempts a claim under the MCRA must assess whether the two claims are based on the same facts and events."). Crucially, to be able to bring a Chapter 151B claim in state or federal court, a plaintiff must have filed charges with the Massachusetts Commission Against Discrimination (MCAD) within 300 days of experiencing the adverse action. <u>Rae v. Woburn Pub. Sch.</u>, 113 F.4th 86, 99 (1st Cir. 2024) (citing Mass. Gen. Laws ch. 151B, § 5), <u>cert. denied</u>, 145 S. Ct. 1431 (2025).

Unlike the federal and state employment statutes discussed <u>supra</u>, certain subsections of section 4 of Chapter 151B apply not just to "employers," defined to include employers of domestic workers, such as Oliveira, Mass. Gen. Laws ch. 151B, § 1(5), but also to "any person," <u>id.</u> § 4(4), (4A), (5), that is, to non-employers, such as Sousa.[5] See <u>Psy-Ed Corp. v. Klein</u>, 947 N.E.2d 520, 531 (Mass. 2011) (noting that sections 4(4) and 4(4A) do not "expressly require that

---

[5] Pereira is thus wrong to claim, [ECF No. 30 at 16], that Chapter 151B does not apply because Oliveira and Sousa allegedly employed only two domestic workers.

15

an employer-employee relationship exist at the time of the wrongful conduct, or at any other time"); Barton v. Clancy, 632 F.3d 9, 21 (1st Cir. 2011) (noting that the MCAD and Massachusetts courts have applied section 4(4A) "even where that person is not the plaintiff's employer or employer-agent"); Cagle v. Estes, 531 F. Supp. 3d 419, 435 (D. Mass. 2021) (collecting decisions finding "that a defendant may be held liable for harassing conduct in the workplace absent an employment relationship with the plaintiff"). These subsections prohibit retaliation, coercion, intimidation, threats or interference with another's right to work free of unlawful discrimination and retaliation, as well as aiding and abetting another in a violation of Chapter 151B or otherwise inciting, compelling or coercing unlawful acts. Mass. Gen. Laws ch. 151B, §§ 4(4), 4(4A), 4(5).

Thus, preemption is not defeated by the fact that Sousa, largely for the reasons explained supra, does not qualify as Pereira's employer for purposes of Chapter 151B. See Barton, 632 F.3d at 18 (applying traditional agency law principles to determine existence of employer-employee relationship under Chapter 151B); Jones v. Montachusett Reg'l Transit Auth., No. 19-CV-11093, 2020 WL 1325813, at *8 (D. Mass. Feb. 7, 2020) ("For the provisions applicable to 'employers,' 'federal and Massachusetts law use roughly identical tests based on traditional agency law principles.'" (quoting Speen v. Crown Clothing Corp., 102 F.3d 625, 632 (D. Mass. 1996))), report and recommendation adopted sub nom. Jones v. Montachusetts Reg'l Transit Auth., No. 19-cv-11093, 2020 WL 1333097 (D. Mass. Mar. 4, 2020). Instead, the issue is whether Chapter 151B remedies were available to Pereira against Sousa, and whether her MCRA and MERA claims are based on "the same facts and events" that would have supported a claim under Chapter 151B. Gordon-Johnson, 766 F. Supp. 3d at 324.

Here, according to the Amended Complaint, Sousa interfered with Pereira's right "to make and enforce contracts" based on her race and national origin. [Am. Compl. ¶¶ 89–92]. Specifically, Pereira asserts that Sousa "advised" and "instructed" Oliveira not to pay Pereira minimum wage or overtime "due to [Pereira's] immigration status" and because of Sousa's "discriminatory animus against her for being of Brazilian ethnicity." [Id. ¶ 44]. In other words, Pereira claims that Sousa interfered with and aided and abetted Oliveira in interfering with Pereira's right to work free of discrimination, in reliance on facts and events that would have given rise to a claim against Sousa under sections 4(4A) and 4(5) of Chapter 151B. Accordingly, Pereira cannot now pursue a claim under MCRA and MERA. James, 2020 WL 108266, at *4. Sousa's motion to dismiss Counts VI and VIII is therefore **GRANTED**.

### D.    Breach of Contract (Count VII)

Count VII claims a "Breach of Contract, Unjust Enrichment/Quantum Meriut [sic]." [Am. Compl. ¶¶ 85–87]. Pereira does not oppose Sousa's motion to dismiss Count VII. See [ECF No. 30 at 6, 21–22]. Accordingly, Sousa's motion to dismiss Count VII is **GRANTED**.

## IV.    CONCLUSION

For the reasons set forth above, Sousa's motion to dismiss all claims against him, [ECF No. 26], is **GRANTED** without prejudice.[6]

---

[6] Sousa filed the instant motion to dismiss on behalf of himself only, not on behalf of the Estate, but he renews his argument that Mass. Gen. Laws ch. 190B, § 3-803 bars Pereira's suit against the Estate (or against Sousa as the Estate's personal representative). See [ECF No. 27 at 5–7]. Pereira responds that her claims are against Sousa in his personal capacity, not against the Estate. [ECF No. 30 at 9–10]. Thus, it appears that Pereira has abandoned her claims against the Estate. To the extent she has not, the Court agrees that Mass. Gen. Laws ch. 190B, § 3-803, which requires actions against a deceased person to be commenced within one year of that person's death by service on the personal representative of the estate (with a narrow exception for personal-injury actions where the judgment will "only be satisfied from the proceeds of a policy

**SO ORDERED.**

July 11, 2025                                             */s/ Allison D. Burroughs*
                                                           ALLISON D. BURROUGHS
                                                           U.S. DISTRICT JUDGE

---

of liability bond or liability insurance"), bars Pereira's action against the Estate.  The Court thus also **DISMISSES** Pereira's claims against the Estate.  See Fed. R. Civ. P. 4(m).